Stephen S. Dunn
Kent L. Hawkins
**MERRILL & MERRILL, CHARTERED**
109 North Arthur - 5th Floor
P.O. Box 991
Pocatello, ID 83204-0991
(208) 232-2286
(208) 232-2499 Telefax



Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CORPORATION OF THE PRESIDENT ) | |
| OF THE CHURCH OF JESUS CHRIST ) | |
| OF LATTER-DAY SAINTS, and ) | Case No. CIV 98-149-E-BLW |
| CORPORATION OF THE PRESIDING ) | |
| BISHOP OF THE CHURCH OF JESUS ) | **DEFENDANT'S MEMORANDUM** |
| CHRIST OF LATTER-DAY SAINTS, ) | **IN OPPOSITION TO PLAINTIFF'S** |
| ) | **MOTION FOR PARTIAL** |
| Plaintiffs, ) | **SUMMARY JUDGMENT** |
| ) | |
| vs. ) | |
| ) | |
| FARM BUREAU MUTUAL ) | |
| INSURANCE COMPANY OF IDAHO, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This Memorandum is filed in opposition to the Plaintiff's Motion for Partial Summary Judgement (and accompanying Memorandum of Law) filed herein.

### INTRODUCTION

The plaintiffs (the "Church") have filed a motion for a partial summary judgment seeking a ruling on "liability under an umbrella policy (Policy No. 01-U011561-03) and Defendant Farm Bureau Mutual Insurance Company of Idaho's breach of duties to defend and indemnify Brett Smith."



The Church concedes that it would be unable to obtain a summary judgment on the issue of whether it is entitled to summary judgment under the Country Squire policy. This concession was made because the Church believes that there are issues of fact regarding whether the vehicle was "available for regular use" as required by the Country Squire policy.[1]  Farm Bureau's response is simple: The Umbrella is a "following form." This means it does not apply unless the underlying policy, the Country Squire, applies. As established by Farm Bureau in its memorandum in support of Farm Bureau's motion for summary judgment, the Country Squire does not apply to this accident because the Church's vehicle was "available for regular use" by Brett Smith. Thus, the regular use restriction in the Country Squire also precludes coverage under the Umbrella. The Church's admission that it could not obtain a summary judgment regarding the regular use issue can appropriately be characterized as an admission that the Church's Motion for Partial Summary Judgment on the Umbrella should be denied.

The major portion of the Church's memorandum focuses on the issue of whether Brett Smith is an insured resident of his parents' household. This was not the primary reason given by Farm Bureau for denying coverage. Farm Bureau primarily denied coverage because of the regular use requirement; the resident of household issue was raised as an additional ground for denying coverage.[2] If the Court grants Farm Bureau's

---

[1]Farm Bureau agrees that the Church would not be entitled to a summary judgment on the Country Squire policy, but Farm Bureau has filed a motion for summary judgment on the Country Squire policy, and on the Umbrella, based on the regular use requirement contained in the Country Squire and based on the agreement between the Smiths and Farm Bureau not to insure Brett Smith. However, Farm Bureau's motion for summary judgment is addressed in a separate set of memoranda submitted in support of Farm Bureau's motion for summary judgment. Those arguments will not be repeated here.

[2]Plaintiff's undisputed fact No. 12, which has been admitted by the Church states: "12. Richard Petersen, representing Farm Bureau, in a letter dated November 1, 1994, notified Mr. Rytting for the LDS Church that there was no coverage for this accident because the vehicle involved in the accident was not a covered "non-owned vehicle" under the Country Squire policy because it had been assigned to Brett Smith for

motion for summary judgment based on the regular use language, the Court does not even need to address the issue of whether Brett Smith was an insured resident of his parents' household.[3]   In other words, even if the Court were to find that Brett was an insured resident of his parents' household, the Court should still rule that there is no coverage based on the regular use language.  Thus, the Court need not consider the household issue at all since it is not dispositive of this suit.

Nevertheless, if the Court finds it necessary to consider the resident of household issue it will discover, as discussed below, that there are significant issues of fact regarding whether Brett Smith was an insured resident of his parents' household.

In summary, the Church's motion for summary judgment is moot because its Complaint can be dismissed based on its failure to establish that the church's vehicle was not available for Brett Smith's regular use.  Alternatively, the Church's motion should be denied because there are issues of fact regarding whether Brett Smith was an insured resident of his parents' household.

ARGUMENT

I.

WHERE THERE IS NO AMBIGUITY IN A CONTRACT A COURT SHOULD NOT ENTER AN ADVERSE RULING MERELY BECAUSE ONE PARTY IS AN INSURANCE COMPANY.

The Church correctly points out the general rule that where an insurance contract is ambiguous, it should be construed against the drafter.  However, the rule applies only

---

his "regular use."  Alternatively, Mr. Petersen indicated there were issues with regard to whether Brett Smith was a resident of his father's household at the time of the accident."

[3]In addition to using the regular use provision to grant summary judgment, the court could rule that Farm Bureau and the Smiths had an agreement not to insure Brett and dismiss the Complaint on that basis.  See Defendant's Memorandum in Support of Motion for Summary Judgment, pages 8 to 9, and 11 to 13; see also Defendant's Reply Memorandum regarding Defendant's Motion for Summary Judgment, pages 1 to 5.

when there is an ambiguity in the language of the contract. *Shadoan v. Liberty Mutual Fire Ins. Co.*, 894 P.2d 1140, 1142 (Okl. 1995). In a situation where the language in an insurance policy is unambiguous, there is no need for interpretation and the rule is inapplicable. The rule was never intended to be an all purpose "club" for claimants to wield against insurance companies. The purpose of the rule is not to mandate that insurance companies be treated unfairly and the rule certainly does not establish a presumption of coverage. In fact, even if there is a determination that a policy provision is ambiguous, that simply means that the court is required to interpret the provision; it does not dictate that there should be a recovery under that provision, as interpreted. Coverage pursuant to the provision, as interpreted, may still need to be resolved by the fact finder, depending on whether there are any genuine issues of fact.[4]

Farm Bureau's position is that its policy is unambiguous, as applied to Brett Smith's particular situation, and that the rule of construction regarding ambiguities relied on by the Church does not apply to this case. This is true for both the resident of household language and the regular use language.

## II.

### THE CHURCH HAS THE BURDEN OF PROOF ON ALL COVERAGE ISSUES; THIS INCLUDES PROVING THAT BRETT WAS OPERATING A COVERED "NONOWNED VEHICLE," I.E., THAT THE CHURCH VEHICLE WAS NOT AVAILABLE FOR BRETT SMITH'S REGULAR USE, AS WELL AS PROVING THAT BRETT WAS AN INSURED RESIDENT OF HIS PARENTS' HOUSEHOLD

The Church admits that it has the burden of proving that Brett Smith was an insured under both of the policies in this case. The Church then spends the bulk of its memorandum focusing on the question of whether Brett was a resident of his parents household while he was on his mission. The Church then argues that, if Brett was a resident of his parents' household, the burden of proof switches to Farm Bureau to

---

[4]This rule is discussed in detail in "Defendant's Reply Memorandum Regarding Defendant's Motion for Summary Judgment" in the section on Idaho law.

establish that coverage is "vitiated by some exclusion or exception in the policy." This is not accurate. By simply addressing the household issue the Church has not met its burden of proof on coverage. The Church is also required to prove that Brett Smith was operating a covered "nonowned vehicle," i.e. that the Church owned vehicle was not available for his regular use. This is because the nonowned vehicle requirement is a *coverage* requirement, not an exclusion. The Country Squire policy issued to Brett Smith's parents states:

> If a claim is made or a suit is brought against any **insured** for damages because of **bodily injury** or **property damage** arising out of an **occurrence** involving an **insured vehicle** or a *nonowned vehicle*, we will:
>
> 1. Pay up to our limit of liability for the damages for which the **insured** is legally liable;
>
> 2. Provide a defense at our expense by counsel of our choice. . . [Emphasis by italics added.][5]

The term "nonowned vehicle" is then defined as follows:

> **Nonowned Vehicle** means a **trailer** or **motor vehicle** not exceeding two-tons in capacity operated by you or your **relatives** provided the actual use is with the permission of the owner. This vehicle must not be owned by you or your **relatives** or be available for regular use by you or your **relatives**.[6]

Thus, the nonowned vehicle element is clearly a coverage requirement, not an exclusion, and the Church has the burden of proof on that element.

It is not enough for the Church to attempt to prove that Brett Smith was a resident of his parents' household. Even if it could prove the household element as a matter of law, there could still be no summary judgment in favor of the Church because the Church has

---

[5]Country Squire, Section III Coverages, at page 19. Both the Country Squire and the Umbrellas were attached to the Affidavit of Kent L. Hawkins, filed in conjunction with the Defendants Motion for Summary Judgement. Copies were also attached to the Church's "Response in Opposition to Defendant's Motion for Summary Judgment."

Note that words indicated by bold type in the policy have numbered definitions contained in the policy.

[6]Country Squire, Section III—Automobile, Definitions, at page 18.

failed, by its own admission, to also establish that there is no genuine issue of fact on the regular use question. The Church has not met its burden of proof on coverage and it has not switched the burden to Farm Bureau to prove an exception to coverage.

This is true even though the Church's motion attempts to avoid the coverage requirements of the Country Squire policy by going straight to the Umbrella. Exclusion 8 of the Umbrella states:

We do not cover:

* * *

> **8.** **personal injury** or **property damage** arising out of the ownership, maintenance, use or entrustment to others of any **automobile** unless covered by valid and collectible **underlying insurance** *described in the Declarations*, and then only for such hazards for which coverage is available under that policy. [Emphasis by italics added.][7]

This is a clear reference to the Country Squire policy, which is described in the declarations and which was sold in conjunction with the Umbrella. Thus, until the Church has proven coverage under the Country Squire (both on the household issue and the nonowned vehicle/regular use issue) the Court should not consider coverage under the Umbrella.

In summary, the Church must prove that there is coverage for the subject vehicle at the time of the subject incident. This burden requires proof that the Church-owned vehicle being driven by Brett Smith was covered as a nonowned vehicle, i.e. that it was not available for the regular use by Brett Smith. Regardless of how much time the Church spends discussing whether Brett was a member of his parents' household, until it has proven that Brett was operating a covered nonowned vehicle (a vehicle not available for his regular use), there is no need for Farm Bureau to assert any exclusionary provisions, and no partial summary judgment can or should be entered in favor of the Church.

---

[7]Umbrella, Part IV Exclusion 8, page 3.

Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment - Page 6
98-H-2385

III.

## THERE ARE GENUINE AND SIGNIFICANT ISSUES OF FACT REGARDING WHETHER BRETT SMITH WAS A RESIDENT OF HIS PARENTS' HOUSEHOLD.

In the event that the Court does not dismiss the Church's action based on the Church's failure to prove that its vehicle was covered on Brett's parents' policy as a "nonowned vehicle," Farm Bureau submits that there are genuine issues of material fact regarding whether Brett Smith was an insured resident of his parents' household.

> A.     *Brett Smith's parents and Farm Bureau had a clear meeting of the minds that Brett would not be an insured on their policy while he fulfilled his missionary duties for the Church.*

It is undisputed that Brett Smith did not intend to return to his parents' home at all during the two years of service as a missionary for the Church.[8]  It was also expected that there would be no opportunity for him to operate his parents' insured vehicles.[9]  Brett's parents informed Farm Bureau of this fact and received a significant reduction in their premiums.[10]  This is Farm Bureau's practice when any missionary who was formerly insured as a resident of a household leaves on a Church mission.[11]  This was in keeping

---

[8]Affidavit of Brett Smith, paragraph 4; Deposition of Thomas Craig Smith, p. 73, l. 5-8; Deposition of Brett Craig Smith, p. 73, l. 12-14.  See also Deposition of Dwayne L. Liddell, p. 73, l. 7-25, where he agrees that it is the expectation that missionaries will not be permitted to go home at during their missions.  Note: The quoted pages of the Affidavit of Dwayne L. Liddell are attached to the Second Affidavit of Kent L. Hawkins.

[9]Affidavit of Brett Smith, paragraph 4; Affidavit of Candy Seal, paragraph 5.

[10]Affidavit of T. Craig Smith, paragraphs 3-4, 6; see also Defendant's Statement of Undisputed Facts, Nos. 32-39, and Plaintiff's Response Nos. 32-39, which responses quibble over the use of the term "removed" but otherwise largely admit as a fact that the Smiths paid less insurance because both they and Farm Bureau believed their son was not an insured while on his mission.

[11]See Defendant's Statement of Undisputed Facts, No. 37, and Plaintiff's Response No. 37; Affidavit of Candy Seal, paragraph 6.

with the agreement between the Smiths and Farm Bureau that they would receive a reduction in premiums and that their son would not have automobile insurance while on his mission. The Smiths' have made it clear that they had not paid for insurance on Brett during his mission and that they should not be entitled to insurance they did not purchase.[12] Brett's father, Thomas Craig Smith specifically testified that there was a "mutual feeling" between him and his Farm Bureau agent that there was no coverage for Brett.[13]

Thus, as previously argued by Farm Bureau in its Memorandum in Support of Motion for Summary Judgement, Section III, page 8-9, it is unfair for the Church, a third party to the agreement, to now come and insist on a recovery after the actual parties to the agreement, Farm Bureau and the Smiths, specifically agreed, and still agree, there was no coverage under the policy.[14]

B.   *There are genuine issues of material fact regarding whether Brett Smith was an insured resident of his parents' household.*

No cases have been found by either party specifically addressing the issue of whether missionaries for the Church are residents of their parents' households while they serve as missionaries. There are cases cited by the Church that indicate that college students may be considered residents of their parents' households. However, the situation of a missionary for the Church, and specifically the facts and circumstances of Brett Smith's serving as a missionary, are remarkably different than that of a college student.

_____

[12]See Deposition of Thomas Craig Smith, p. 54, l. 25: "I guess the only reason I would have would be just as I previously stated. If I'm not paying for it, how do I get it, . . ." See also quoted material at pages 11 to 13 of Defendant's Memorandum in Support of Motion for Summary Judgment.

[13]Deposition of Thomas Craig Smith, p. 46, l. 2, and generally testimony at pages 44-46.

[14]Affidavit of T. Craig Smith, paragraphs 3-4, 6.

Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment - Page 8
98-H-2385

It is undisputed that Brett expected to be gone for two complete years and did not expect or intend to return to his parents' home at all during that two year period of time.[15] Thus, during this two year period of time he would have no opportunity to operate any of his parents' insured vehicles. This was understood by Farm Bureau and formed part of the basis of their decision to not charge a premium for Brett Smith. This is unlike the situation of a college student who may come home for weekends, holidays, and vacations and operate his parents' vehicles, or who may even have taken one of his parents' vehicles to college with him.

In addition to the general difference between a college student and a Church missionary, there are specific facts that indicate that Brett Smith should not be considered a resident of his parent's household. For instance, Brett had already moved out of his parent's home prior to leaving on his mission. He had been attending college at Idaho State University and had moved into his own apartment in Pocatello, Idaho.[16] He moved back into his parents' home only very briefly "at the last minute" before he left to be a missionary.[17] Brett specifically testified that he lived in his college apartment until he left on his mission and that he only went back to his parents' home for a few days until he left to be a missionary.[18] Brett's father characterized Brett's brief return to their home prior to his mission as lasting only a few days, although Brett's parents had hoped he would

---

[15]Deposition of Thomas Craig Smith, p. 73, l. 5-8; Deposition of Brett Craig Smith, p. 73, l. 12-14. See also Deposition of Dwayne L. Liddell, p. 73, l. 7-25, where he agrees that it is the expectation that missionaries will not be permitted to go home during the time that they are missionaries.

[16]Deposition of Thomas Craig Smith, p. 31, l.4-8; Affidavit of Brett C. Smith, Par. 4.

[17]Deposition of Brett Craig Smith, p. 56, l. 3-5 and pp. 64-68; Deposition of Brett Craig Smith, p. 72, l. 11-23.

[18]Deposition of Brett Craig Smith, p. 66, l. 19-22; Affidavit of Brett C. Smith, Par. 4.

come and spend a little more time with them.[19]  During the time Brett had this college apartment he considered himself to be on his own and making his own decisions.[20]  His parents kept him on their insurance only because he had the use of one of their cars while at ISU.[21]

After his mission, Brett moved into his parents' home only temporarily until he returned to ISU and got his own apartment again.[22]  He did not get his bedroom back but slept in the basement, in a spare unfinished room, while he found an apartment to return to ISU.[23]  It was always his intention to return to ISU after his mission and to have his own apartment again.[24]  His parents agree that Brett was not planning on returning to live on their farm with them and that he did not intend to become a farmer.[25]

Farm Bureau agrees with the Church that a primary consideration in determining whether a person is an insured resident of a household is whether they intended to be a resident of that household.  It is clear that Brett Smith considered himself no longer a resident of his parents' household while he was a missionary and that his parents' no longer considered him to be a resident of their household.  The only reason they carried him on their insurance while he was at ISU prior to his mission was because he had a family owned car with him.  Once he left on his mission, and would no longer be driving

---

[19]Deposition of Brett Craig Smith, p. 55, l. 11-21; p. 56, l. 3-5.

[20]Deposition of Brett Craig Smith, p. 70, l. 19 to p. 71, l. 3.

[21]Deposition of Brett Craig Smith, p. 71, l. 3-18.

[22]Deposition of Thomas Craig Smith, p. 56, l. 6-17.

[23]Deposition of Thomas Craig Smith, p. 56, l. 18 to p. 57, l. 8.

[24]Affidavit of Brett C. Smith, paragraph 4; Deposition of Brett Craig Smith, p. 72, l. 24 to p. 73, l. 8.

[25]Affidavit of T. Craig Smith, paragraph 5; Deposition of Thomas Crag Smith,, p. 55, l. 23 to p. 56, l. 6-17.

his parents' vehicles, they took him off their insurance and were given a significant premium discount. Neither Brett nor his parents expected him to return and live with them as a resident of their household.[26]  Thus, there is ample evidence that Brett was not a resident of their household during his mission.

The determination as to whether Brett Smith was an insured resident of his parents' household is a highly fact based determination that takes into account, among other things, his intent at the time he left to be a missionary.  Based on the highly factual nature of this determination, a summary judgment is impossible, even on the limited resident of household issue.  There is certainly enough evidence that he was not a resident of his parents' household to easily defeat the Church's motion for partial summary judgment.

    c.    *The Church's arguments regarding whether Brett Smith had other possible "residences" is irrelevant.*

The Church claims that if Farm Bureau cannot designate some other location as Brett's residence during his mission, that this constitutes "iron clad" evidence that Brett's parents' home is his residence.  This is not an "iron clad" argument for two reasons. First, it is entirely possible that Brett intended his mission to be his residence and that where ever he lived on his mission was his residence, even though temporary.  The fact that Brett knew he would not be a missionary forever, and that he would be transferred from city to city, does not mean that he did not have residence at other locations.

Second, it is reasonably possible that, for insurance purposes, Brett had no household.  There is no requirement that a person have any residence for purposes of insurance.  The absence of another residence does not create residence at a person's parents' household by default. There must be proof that the person intended to remain a member of the household.  Note that the burden of proof is on the Church to prove that Brett was a resident of his parents' household–not for Farm Bureau to prove that Brett did

---

[26]Affidavit of T. Craig Smith, paragraphs 5; Affidavit of Brett C. Smith, Par. 4.

not have any other residence. For instance, if Brett had moved to San Diego to live on the beach and be a surfer, he would probably not be considered to have a place of residence. However, if his intent was to no longer live with his parents, he would not be considered a resident of their household, regardless of the absence of some other place of residence. A debate over where his residence was, if not with his parents, is not material to the resolution of this issue.

The material question is whether Brett Smith and his parents intended his residence to be his parents' home while he served a mission for the Church. The undisputed facts lead to the conclusion that there was no such intent. At worst, from Farm Bureau's point of view, this is a disputed factual question.

IV.

THE CHURCH'S INSURANCE, THE KEMPER POLICY, PROVIDED PRIMARY COVERAGE ON BRETT SMITH'S VEHICLE AND KEMPER–NOT FARM BUREAU–HAD THE DUTY TO DEFEND BRETT SMITH.

At pages 11 to 14 of its memorandum the Church, erroneously believing that its discussion of the resident of household issue completes their burden of proof as to the Umbrella policy, proceeds to argue that Farm Bureau failed in its obligation to defend and indemnify Brett Smith in the suit filed by Danne Dutcher ("the Dutcher suit"). This argument overlooks the real reason coverage under both policies was denied–the regular use requirement. It also overlooks the obvious issues of material fact regarding whether Brett was an insured resident of his parents' household while on his mission.

However, even with the regular use issue and the resident of household issues set aside, Farm Bureau still would not have had a duty to defend Brett Smith in the Dutcher action. In 1992 each missionary in the United States and Canada, including Brett Smith, was insured while operating Church owned vehicles, with liability limits of up to $100,000 under the Church's Kemper policy.[27] This Kemper policy covers the Church's fleet of

---

[27]Deposition of Dwayne L. Liddell, p. 16, l. 22 to p. 17, l. 2.

vehicles, which included from 10,000 to 10,500 vehicles in 1992, of which about 7,000 were being used by missionaries like Brett Smith.[28]

When the driver of a vehicle has insurance separate from the owner of the vehicle, and both the drivers' and the owners' insurance apply to an accident, it is an "almost universal rule" that the owners' policy is primary and that it is the owners' insurance which has the duty to defend. *Allstate Ins. Co. v. State Automobile Mutual Ins. Co.*, 364 S.E.2d 30, 32 (W. Vir. App. 1987). Thus, the Church's insurer had the primary duty to defend Brett Smith, not Farm Bureau.

The fact that Farm Bureau did not have an obligation to defend Brett Smith, even if there had been coverage, is made clear not only by the case law, but also because the Farm Bureau policy specifically states that it is excess, while the Church's policy, the Kemper Policy, specifically states that it is primary. The Country Squire policy states:

> 11.   **Other Insurance.** The insurance under Section III is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy [referencing the Umbrella policy]. [Bracketed material added.][29]

Likewise, the Farm Bureau Umbrella provides:

> 3.   **Other Insurance:** This insurance is excess over other collectable insurance.[30]

Thus, both the Country Squire and the Umbrella indicate that they are excess to other coverage.

By contrast, the Church's Kemper policy specifically states that it is primary:

---

[28]Deposition of Dwayne L. Liddell, p. 10, l. 8 to p. 11, l. 15 and p. 16, l. 25 to p. 17, l. 2. The Church had about 50,000 missionaries serving in 1992, a substantial number of which were in the U.S. and Canada.

[29]Country Squire, page 22.

[30]Umbrella, page 5.

Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment - Page 13
98-H-2385

B.  OTHER INSURANCE

1.    For any covered auto you [the Church] own this policy
      provides primary insurance.[31]

Additionally, Mr. Dwayne L. Liddell, the Director of Risk Management for the Corporation of the Presiding Bishop (one of the two plaintiffs), testified that the Church's Kemper policy included a duty to defend Brett Smith.[32]  Mr. Liddell also readily admitted that the Church's Kemper policy was the primary or "first-in-line" insurance on the Church vehicle.[33]  He specifically agreed that the Kemper policy included both a duty to indemnify Brett Smith and to defend him and that this duty was "in-line" before any other policy.[34]  This duty to defend was not limited by the $100,000 indemnity provisions of the Kemper policy but was in addition to that limit.  Thus regardless of the cost of defense, Kemper, not Farm Bureau, had the first and primary duty to defend Brett Smith.

It is important to note Mr. Liddell's admission that the Church "stepped in" and defended Brett Smith even though it knew that its insurer, Kemper, had that legal duty.[35]  This resulted in the Church paying all of its own defense costs, as well as all of Brett

---

[31]Kemper Policy, page 3-4.  A copy of this policy was first given to Farm Bureau on March 9, 1999.  A copy is attached hereto.

[32]Deposition of Dwayne L. Liddell, p. 26, l. 15-22.

[33]Deposition of Dwayne L. Liddell, p. 36, l. 14-17: "Q. Would you consider the Kemper policy to be the primary or the first-in-line policy for any accident involving a mission vehicle?  A.  Generally speaking, yes."

[34]Deposition of Dwayne L. Liddell, p. 53, l. 12-24: Q. Would you agree, as you sit here today, that the Kemper policy did apply to both defending and indemnifying Brett Smith in the Dutcher case?  A.  Yes.  Q.  Was it primary?  A.  Yes.  Q.  If I understand your position, it would be that the Kemper policy is primary, Farm Bureau should stand next in line if, in fact, Brett Smith is appropriately insured under that policy, then the Church would, under its retention of risk, accept any obligation in excess of those policies?  A.  Yes.

[35]Deposition of Dwayne L. Liddell, p. 27, l. 11 to p. 30, l. 3.

Smith's, so that the Kemper policy did not have to pay any of Brett Smith's defense costs.[36] Essentially, the Church volunteered, apparently with no legal obligation, to pay Brett Smith's defense costs, rather than have the appropriate insurance company–Kemper–pay those costs.

Given the undisputed fact that it was Kemper, not Farm Bureau, who had the duty to defend the Dutcher action, it is meritless for the Church to argue that Farm Bureau breached any duty to defend Brett Smith. Even it the Farm Bureau policies applied (which they did not) there still would have been no duty for Farm Bureau to defend Brett Smith in the Dutcher suit. That responsibility belonged to the Church's insurance company–Kemper Insurance.

In summary, the Church cannot recover its defense costs[37] incurred in defending itself and Brett Smith in the underlying action for several reasons: (1) Farm Bureau and the Smiths had agreed there would be no coverage; (2) Brett was not driving a covered non-owned vehicle because the Church's vehicle was available to him for his regular use; (3) Brett was not an insured resident of his parents' household; (4) the church's insurer, Kemper, had the primary duty to defend; and (5) the Church voluntarily assumed Brett Smiths defense and cannot "skip over" the Kemper policy and seek subrogation for the defense costs from Farm Bureau.

---

[36]Deposition of Dwayne L. Liddell, p. 27, l. 11 to p. 28, l. 22; p. 62, l. 1-6.

[37]Note that in asserting that Farm Bureau failed to defend Brett Smith, the Church also failed to distinguished its own defense costs, since it was also a defendant in that Dutcher suit, from any costs incurred in defending Brett Smith.

V.

THE CHURCH IS NOT ENTITLED TO EQUITABLE SUBROGATION FOR EITHER
THE AMOUNTS PAID OR THE DEFENSE COSTS BECAUSE IT VOLUNTARILY
PAID THOSE AMOUNTS.

The elements of subrogation under Idaho law are correctly and adequately stated by

the Church in its memorandum at page 15:

> One who claims to be equitably subrogated to the rights of a creditor must
> satisfy certain prerequisites: (1) payment must be made pursuant to an
> obligation to do so, or in order to protect the subrogee's own interest, i.e.,
> *the subrogee must not be making the payments as a mere volunteer*; (2) the
> debt paid must be one for which the subrogee *was not primarily liable*; (3)
> the entire debt must be paid; and finally, (4) the subrogation *must not work
> any injustice to the rights of others*. [Italics added.]

*Hoopes v. Hoopes*, 861 P.2d 88, 91 (Idaho App. 1993). Note that the Church's claim for

subrogation violates three of these elements. First, Mr. Liddell readily admitted that the

Church stepped forward to defend Brett Smith although the Church had no apparent

responsibility to do so since they have denied that he was an "authorized agent representing

one or both of the plaintiffs."[38] Thus, one wonders why they would defend Brett Smith,

except as a volunteer. The Church certainly could have defended itself, without defending

Brett Smith, if it felt it had no agency relationship with Brett Smith. Second, the subrogee,

the Church, was not primarily liable to defend Brett Smith. As discussed above, this was

clearly the duty of Kemper.[39] Third, it would be inequitable to require Farm Bureau to

respond to the subrogation claim of the Church where Farm Bureau had not charged a

---

[38]Defendants Request for Admission No. 1 stated:  "Admit that Brett Smith
was an authorized agent representing one or both of the Plaintiffs on June 2, 1993, at the
time of the "accident" described in paragraph 6 of your complaint."  The Church replied:
"Plaintiff's deny Request for Admission No. 1."  See Plaintiffs' Answers to Defendant's
Requests for Admissions . . ., page 5-6. [Signed by Dwayne L. Liddell.]

[39]Interestingly, the Church has made no effort to distinguish its own defense
costs from those in incurred on behalf of Brett Smith.  Apparently the Church believes that
Farm Bureau should have provided a free defense for the Church as well as for Brett
Smith.

premium to the Smiths to insure Brett Smith while he was operating Church owned vehicles. Fourth, and most importantly, it would be inequitable to require Farm Bureau to pay subrogation to the Church in a case where there is no coverage, as established above, and <u>particularly</u> where it had no duty to defend Brett Smith or the Church, even if there had been coverage.

VI.

## THE CHURCH IS NOT ENTITLED TO CONTRIBUTION BECAUSE THERE IS SIMPLY NO COVERAGE UNDER EITHER FARM BUREAU POLICY

The response to the Church's final argument is simple. The Church has no valid claim for contribution because this accident did not involve a nonowned insured vehicle and, alternatively, because Brett was not an insured resident of his parents' household. These issues are discussed above and in conjunction with Farm Bureau's motion for summary judgment.

CONCLUSION

Farm Bureau respectfully requests that the Church's Motion for Summary Judgment be denied.

DATED this 31st day of March, 1999.

MERRILL & MERRILL, CHARTERED

By _____
Kent L. Hawkins
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I, Kent L. Hawkins, the undersigned, one of the attorneys for the Defendant, in the above-entitled matter, do hereby certify that a true, full and correct copy of the foregoing Motion to File Amended Answer was this 31st day of March, 1999, served upon the following in the manner indicated below:

Ron Kerl, Esq.  
Steven V. Richert, Esq.  
SERVICE, GASSER & KERL  
P.O. Box 6009  
Pocatello, ID 83205-6009  

[ ✗ ] U.S. Mail  
[_] Hand Delivery  
[_] Overnight Delivery  
[_] Telefax  

Charles W. Dahlquist II, Esq.  
Randy T. Austin, Esq.  
Alexander Dushku, Esq.  
KIRTON & McCONKIE  
P.O. Box 45120  
Salt Lake City, UT 84145-0120  

[ ✗ ] U.S. Mail  
[_] Hand Delivery  
[_] Overnight Delivery  
[_] Telefax  

C. Keith Rooker, Esq.  
James B. Gibson, Esq.  
ROOKER & GIBSON  
701 N. Green Valley Parkway #105  
Henderson, NV 89014-6337  

[ ✗ ] U.S. Mail  
[_] Hand Delivery  
[_] Overnight Delivery  
[_] Telefax  

Kent L. Hawkins

LUMBERMENS MUTUAL CASUALTY COMPANY
AMERICAN MOTORISTS INSURANCE COMPANY
AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY

**Kemper GROUP**

*1985*

*CORP OF PA BISHOP*

Non-assessable

## BUSINESS AUTO POLICY

LUMBERMENS
MUTUAL
CASUALTY
COMPANY
A mutual insurance company,
herein called the Company
Home Office:
Long Grove, IL 60049

AMERICAN
MOTORISTS
INSURANCE
COMPANY
A stock insurance company,
herein called the Company
Home Office:
Long Grove, IL 60049

AMERICAN
MANUFACTURERS
MUTUAL
INSURANCE
COMPANY
A mutual insurance company,
herein called the Company
Home Office:
Long Grove, IL 60049

The company providing the insurance afforded by this policy is designated on the Declarations Page. If such company is a mutual company, the insured is hereby notified that by virtue of this policy he is a member of the company so designated and is entitled to vote either in person or by proxy at any and all meetings of the company.

The annual meeting of the Lumbermens Mutual Casualty Company is held at its home office in Long Grove, IL, on the third Tuesday in May of each year at eleven o'clock A.M.

The annual meeting of the American Manufacturers Mutual Insurance Company is held at its home office in Long Grove, IL, on the third Tuesday in May of each year at nine o'clock A.M.

**EXHIBIT**

**"A"**

# BUSINESS AUTO POLICY

In return for the payment of the premium and subject to all the terms of this policy, **we** agree with **you** as follows:

## PART I—WORDS AND PHRASES WITH SPECIAL MEANING—READ THEM CAREFULLY

The following words and phrases have special meaning throughout this policy and appear in **boldface type** when used:

**A.** **"You"** and **"your"** mean the person or organization shown as the named **insured** in ITEM ONE of the declarations.

**B.** **"We"**, **"us"** and **"our"** mean the company providing the insurance.

**C.** **"Accident"** includes continuous or repeated exposure to the same conditions resulting in **bodily injury** or **property damage** the **insured** neither expected nor intended.

**D.** **"Auto"** means a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include **mobile equipment**.

**E.** **"Bodily injury"** means **bodily injury**, sickness or disease including death resulting from any of these.

**F.** **"Insured"** means any person or organization qualifying as an **insured** in the WHO IS **INSURED** section of the applicable insurance. Except with respect to **our** limit of liability, the insurance afforded applies separately to each

**insured** who is seeking coverage or against whom a claim is made or suit is brought.

**G.** **"Loss"** means direct and accidental damage or **loss**.

**H.** **"Mobile equipment"** means any of the following type of land vehicles:

1. Specialized equipment such as: Bulldozers; Power shovels; Rollers, graders or scrapers; Farm machinery; Cranes; Street sweepers or other cleaners; Diggers; Forklifts; Pumps; Generators; Air Compressors; Drills; Other similiar equipment.

2. Vehicles designed for use principally off public roads.

3. Vehicles maintained solely to provide mobility for such specialized equipment when permanently attached.

4. Vehicles not required to be licensed.

5. **Autos** maintained for use solely on **your** premises or that part of roads or other accesses that adjoin **your** premises.

**I.** **"Property damage"** means damage to or **loss** of use c. tangible property.

**J.** **"Trailer"** includes semitrailer.

## PART II—WHICH AUTOS ARE COVERED AUTOS

**A.** ITEM TWO of the declarations shows the **autos** that are covered **autos** for each of **your** coverages. The numerical symbols explained in ITEM THREE of the declarations describe which **autos** are covered **autos**. The symbols entered next to a coverage designate the only **autos** that are covered **autos**.

**B.** **OWNED AUTOS YOU ACQUIRE AFTER THE POLICY BEGINS.**

1. If symbols "1", "2", "3", "4", "5" or "6" are entered next to a coverage in ITEM TWO, then **you** already have coverage for **autos** of the type described until the policy ends.

2. But, if symbol "7" is entered next to a coverage in ITEM TWO, an **auto** you acquire will be a covered **auto** for that coverage only if:

a. **We** already insure all **autos** that **you** own for tha' coverage or it replaces an **auto** you previously owned that had that coverage; and

b. **You** tell **us** within 30 days after **you** acquire it that `: you want **us** to insure it for that coverage.

**C.** **CERTAIN TRAILERS AND MOBILE EQUIPMENT.**

If the policy provides liability insurance, the following types of vehicles are covered **autos** for liability insurance:

1. **Trailers** with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. **Mobile equipment** while being carried or towed by a covered **auto**.

## PART III — WHERE AND WHEN THIS POLICY COVERS

**We** cover **accidents** or **losses** which occur during the policy period:

**A.** In the United States of America, its territories or possessions, Puerto Rico or Canada; or

**B.** While the covered **auto** is being transported between any of these places.

## PART IV — LIABILITY INSURANCE

**A.** **WE WILL PAY.**

1. **We** will pay all sums the **insured** legally must pay as damages because of **bodily injury** or **property damage** to which this insurance applies, caused by an **accident** and resulting from the ownership, maintenance or use

2. **We** have the right and duty to defend any suit asking for these damages. However, **we** have no duty to defend suits for **bodily injury** or **property damage** not covered by this policy. **We** may investigate and settle any claim or suit as **we** consider appropriate. **Our** payment of the LIABILITY INSURANCE limit ends **our** duty to defend or settle.

## PART IV — LIABILITY INSURANCE — Continued

### B. WE WILL ALSO PAY.

In addition to our limit of liability, we will pay for the insured:

1. Up to $250 for cost of bail bonds (including bonds for related traffic law violations) required because of an accident we cover. We do not have to furnish these bonds.

2. Premiums on appeal bonds in any suit we defend.

3. Premiums on bonds to release attachments in a suit we defend but only for bonds up to our limit of liability.

4. All costs taxed to the insured in a suit we defend.

5. All interest accruing after the entry of the judgment in a suit we defend. Our duty to pay interest ends when we pay or tender our limit of liability.

6. Up to $50 a day for loss of earnings (but not other income) because of attendance at hearings or trials at our request.

7. Other reasonable expenses incurred at our request.

### C. WE WILL NOT COVER — EXCLUSIONS.

This insurance does not apply to:

1. Liability assumed under any contract or agreement.

2. Any obligation for which the insured or his or her insurer may be held liable under any workers' compensation or disability benefits law or under any similar law.

3. Any obligation of the insured to indemnify another for damages resulting from bodily injury to the insured's employee.

4. Bodily injury to any fellow employee of the insured arising out of and in the course of his or her employment.

5. Bodily injury to any employee of the insured arising out of and in the course of his or her employment by the insured. However, this exclusion does not apply to bodily injury to domestic employees not entitled to workers' compensation benefits.

6. Property damage to property owned or transported by the insured or in the insured's care, custody or control.

7. Bodily injury or property damage resulting from the handling of property:
   a. Before it is moved from the place where it is accepted by the insured for movement into or onto the covered auto or
   b. After it is moved from the covered auto to the place where it is finally delivered by the insured.

8. Bodily injury or property damage resulting from the movement of property by a mechanical device (other than a hand truck) not attached to the covered auto.

9. Bodily injury or property damage caused by the dumping, discharge or escape of irritants, pollutants or contaminants. This exclusion does not apply if the discharge is sudden and accidental.

### D. WHO IS INSURED.

1. You are an insured for any covered auto.

2. Anyone else is an insured while using with your permission a covered auto you own, hire or borrow except:
   a. The owner of a covered auto you hire or borrow from one of your employees or a member of his or her household.
   b. Someone using a covered auto while he or she is working in a business of selling, servicing, repairing or parking autos unless that business is yours.
   c. Anyone other than your employees, a lessee or borrower or any of their employees, while moving property to or from a covered auto.

3. Anyone liable for the conduct of an insured described above is an insured but only to the extent of that liability. However, the owner or anyone else from whom you hire or borrow a covered auto is an insured only if that auto is a trailer connected to a covered auto you own.

### E. OUR LIMIT OF LIABILITY.

1. Regardless of the number of covered autos, insureds, claims made or vehicles involved in the accident, the most we will pay for all damages resulting from any one accident is the LIABILITY INSURANCE limit shown in the declarations.

2. All bodily injury and property damage resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one accident.

### F. OUT OF STATE EXTENSIONS OF COVERAGE.

1. While a covered auto is away from the state where it is licensed we will:
   a. Increase this policy's liability limits to meet those specified by a compulsory or financial responsibility law in the jurisdiction where the covered auto is being used.
   b. Provide the minimum amounts and types of other coverages, such as "No-Fault", required of out of state vehicles by the jurisdiction where the covered auto is being used.

2. We will not pay anyone more than once for the same elements of loss because of these extensions.

# PART V — PHYSICAL DAMAGE INSURANCE

## A. WE WILL PAY.

1. We will pay for loss to a covered auto or its equipment under:

   a. **Comprehensive Coverage.** From any cause except the covered auto's collision with another object or its overturn.

   b. **Specified Perils Coverage.** Caused by:
      (1) Fire or explosion;
      (2) Theft;
      (3) Windstorm, hail or earthquake;
      (4) Flood;
      (5) Mischief or vandalism;
      (6) The sinking, burning, collision or derailment of any conveyance transporting the covered auto.

   c. **Collision Coverage.** Caused by the covered auto's collision with another object or its overturn.

2. **Towing.**

   We will pay up to $25 for towing and labor costs incurred each time a covered auto of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

## B. WE WILL ALSO PAY.

We will also pay up to $10 per day to a maximum of $300 for transportation expense incurred by you because of the total theft of a covered auto of the private passenger type. We will pay only for those covered autos for which you carry either Comprehensive or Specified Perils Coverage. We will pay for transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered auto is returned to use or we pay for its loss.

## C. WE WILL NOT COVER—EXCLUSIONS.

This insurance does not apply to:

1. Wear and tear, freezing, mechanical or electrical breakdown unless caused by other loss covered by this policy.

2. Blowouts, punctures or other road damage to tires unless caused by other loss covered by this policy.

3. Loss caused by declared or undeclared war or insurrection or any of their consequences.

4. Loss caused by the explosion of a nuclear weapon or its consequences.

5. Loss caused by radioactive contamination.

6. Loss to tape decks or other sound reproducing equipment not permanently installed in a covered auto.

7. Loss to tapes, records or other sound reproducing devices designed for use with sound reproducing equipment.

8. Loss to any sound receiving equipment designed for use as a citizens' band radio, two-way mobile radio or telephone or scanning monitor receiver, including its antennas and other accessories, unless permanently installed in the dash or console opening normally used by the auto manufacturer for the installation of a radio.

## D. HOW WE WILL PAY FOR LOSSES—THE MOST WE WILL PAY.

1. At our option we may:

   a. Pay for, repair or replace damaged or stolen property; or

   b. Return the stolen property, at our expense. We will pay for any damage that results to the auto from the theft.

2. The most we will pay for loss is the smaller of the following amounts:

   a. The actual cash value of the damaged or stolen property at the time of loss.

   b. The cost of repairing or replacing the damaged or stolen property with other of like kind or quality.

3. For each covered auto, our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the declarations. Any Comprehensive Coverage deductible shown in the declarations does not apply to loss caused by fire or lightning.

## E. GLASS BREAKAGE—HITTING A BIRD OR ANIMAL—FALLING OBJECTS OR MISSILES.

We will pay for glass breakage, loss caused by hitting a bird or animal or by falling objects or missiles under Comprehensive Coverage if you carry Comprehensive Coverage for the damaged covered auto. However, you have the option of having glass breakage caused by a covered auto's collision or overturn considered a loss under Collision Coverage.

# PART VI—CONDITIONS

The insurance provided by this policy is subject to the following conditions:

## A. YOUR DUTIES AFTER ACCIDENT OR LOSS.

1. You must promptly notify us or our agent of any accident or loss. You must tell us how, when and where the accident or loss happened. You must assist in obtaining the names and addresses of any injured persons and witnesses.

2. Additionally, you and other involved insureds must:

   a. Cooperate with us in the investigation, settlement or defense of any claim or suit. No insured shall, except at his or her own cost, voluntarily make any payment, assume any obligation or incur any expense.

   b. Immediately send us copies of any notices or legal papers received in connection with the accident or loss.

   c. Submit at our expense and as often as we require to physical examinations by physicians we select.

   d. Authorize us to obtain medical reports and other pertinent medical information.

3. Additionally, to recover for loss to a covered auto or its equipment you must do the following:

   a. Permit us to inspect and appraise the damaged property before its repair or disposition.

   b. Do what is reasonably necessary after loss at our expense to protect the covered auto from further loss.

   c. Submit a proof of loss when required by us.

   d. Promptly notify the police if the covered auto or any of its equipment is stolen.

## B. OTHER INSURANCE.

1. For any covered auto you own this policy provides

# PART VI—CONDITIC 5—Continued

primary insurance. For any covered **auto you** don't own, the insurance provided by this policy is excess over any other collectible insurance. However, while a covered **auto** which is a **trailer** is connected to another vehicle the liability coverage this policy provides for the trailer:

    a. Is excess while it is connected to a motor vehicle **you** don't own.

    b. Is primary while it is connected to a covered **auto you** own.

  2. When two or more policies cover on the same basis, either excess or primary, **we** will pay only **our** share. **Our** share is the proportion that the limit of **our** policy bears to the total of the limits of all the policies covering on the same basis.

## C. OUR RIGHT TO RECOVER FROM OTHERS.

If **we** make any payment, **we** are entitled to recover what **we** paid from other parties. Any person to or for whom **we** make payment must transfer to **us** his or her rights of recovery against any other party. This person must do everything necessary to secure these rights and must do nothing that would jeopardize them.

## D. CANCELLING THIS POLICY DURING THE POLICY PERIOD.

  1. **You** may cancel the policy by returning it to **us** or by giving **us** advance notice of the date cancellation is to take effect.

  2. **We** may cancel the policy by mailing **you** at least 10 days notice at your last address known by **us**. **We** may deliver any notice instead of mailing it. Proof of mailing of any notice will be sufficient proof of notice.

  3. The effective date of cancellation stated in the notice shall become the end of the policy period.

  4. If this policy is cancelled, **you** may be entitled to a premium refund. If so, **we** will send **you** the refund. However, making or offering to make the refund is not a condition of cancellation. If **you** cancel, the refund, if any, will be computed in accordance with the customary short rate procedure. If **we** cancel, the refund, if any, will be computed pro rata.

## E. LEGAL ACTION AGAINST US.

No legal action may be brought against **us** until there has been full compliance with all the terms of this policy. In addition, under LIABILITY INSURANCE, no legal action may be brought against **us** until **we** agree in writing that the **insured** has an obligation to pay or until the amount of that obligation has been finally determined by judgment after trial. No person or organization has any right under this policy to bring **us** into any action to determine the liability of the **insured**.

## F. INSPECTION.

At **our** option **we** may inspect **your** property and operations at any time. These inspections are for **our** benefit only. By **our** right to inspect or by **our** making any inspection **we** make no representation that **your** property or operations are safe, not harmful to health or comply with any law, rule or regulation.

## G. CHANGES.

This policy contains all the agreements between **you** and **us**. Its terms may not be changed or waived except by endorsement issued by **us**. If a change requires a premium adjustment, **we** will adjust the premium as of the effective date of change. If **we** revise this policy form to provide more coverage without additional premium charge **your** policy will automatically provide the additional coverage as of the day the revision is effective in **your** state.

## H. TRANSFER OF YOUR INTEREST IN THIS POLICY.

**Your** rights and duties under this policy may not be assigned without **our** written consent.

## I. NO BENEFIT TO BAILEE—PHYSICAL DAMAGE INSURANCE ONLY.

**We** will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this policy.

## J. BANKRUPTCY.

Bankruptcy or insolvency of the **insured** shall not relieve **us** of any obligations under this policy.

## K. APPRAISAL FOR PHYSICAL DAMAGE LOSSES.

  1. If **you** and **we** fail to agree as to the amount of loss either may demand an appraisal of the **loss**. In such event, **you** and **we** shall each select a competent appraiser, and the appraisers shall select a competent and disinterested umpire. The appraisers shall state separately the actual cash value and the amount of loss, and, failing to agree, shall submit their differences to the umpire. An award in writing of any two shall determine the amount of **loss**. **You** and **we** shall each pay the chosen appraiser and shall bear equally the other expenses of the appraisal and umpire.

  2. **We** shall not be held to have waived any of **our** rights by any act relating to appraisal.

## L. TWO OR MORE POLICIES ISSUED BY US.

If this policy and any other policy issued to **you** by **us** or any company affiliated with **us** apply to the same ac**cident**, the aggregate maximum limit of liability under all the policies shall not exceed the highest applicable limit of liability under any one policy. This condition does not apply to any policy issued by **us** or an affiliated company specifically to apply as excess insurance over this policy.

CA 00 01 (Ed. 01-80)

Copyright, Insurance Services Office, 1977, 1979

As respects the Company previously designated, the following correlative provision forms a part of this policy:

MUTUAL POLICY CONDITIONS.        **LUMBERMENS MUTUAL CASUALTY COMPANY**
                                 **AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY**

This is a perpetual mutual corporation owned by and operated for the benefit of its members. This is a non-assessable, participating policy under which the Board of Directors in its discretion may determine and pay unabsorbed premium deposit refunds (dividends) to the insured.

As respects the State of Texas, such provision is amended to read as follows:

**Mutuals—Membership and Voting Notice.** The insured is notified that by virtue of this policy he is a member of the company so designated, and is entitled to vote either in person or by proxy at any and all meetings of said company. The Annual Meetings are held in its Home Office at the place and time stated on the front cover.

**Mutuals—Participation Clause Without Contingent Liability.** No Contingent Liability: This policy is non-assessable. The policyholder is a member of such company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

DIVIDENDS.                       **AMERICAN MOTORISTS INSURANCE COMPANY**

This policy is participating and shall be entitled to receive unabsorbed premium deposit refunds as apportioned by the directors.

As respects the State of Texas, such provision is amended to read as follows:

**Dividend Provision—Participating Companies.** The named insured shall be entitled to participate in a distribution of the surplus of the company, as determined by the Board of Directors from time to time, after approval in accordance with the provisions of the Texas Insurance Code, of 1951, as amended.

IN WITNESS WHEREOF, the Company designated on the Declarations Page has caused this policy to be signed by its President and Secretary, but this policy shall not be valid unless countersigned on the Declarations Page by the duly authorized representative of the Company.

**LUMBERMENS MUTUAL CASUALTY COMPANY**
**AMERICAN MOTORISTS INSURANCE COMPANY**
**AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY**

Secretary                        President



CK 1203-2   4-86   10M   (Ed. 01-80)        Jacket Page 5

Reed W. Larsen
COOPER & LARSEN, CHARTERED
151 North 3rd, Suite 210
P. O. Box 4229
Pocatello, Idaho 83205-4229
Telephone: (208) 235-1145

U.S. COURTS

99 APR -1  AM 10: 35

REC'D_____FILED_____
CAMERON S. BURKE

CLERK, IDAHO_____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| CONNIE DAYLEY and MORRIS DAYLEY, husband and wife, | ) ) ) | Case No. CV 94-0071-E-MHW |
| Plaintiffs, | ) ) ) | **MOTION FOR** |
| vs. | ) ) | **SUMMARY JUDGMENT** |
| IDAHO POWER COMPANY, an Idaho corporation, and FIRST HEALTH STRATEGIES, INC., a/k/a FIRST HEALTH, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

COMES NOW the Plaintiff, Connie Dayley, and pursuant to F.R.C.P. 56 hereby

requests the Court to enter an order granting Plaintiff summary judgment on the ground and

for the reason that there is no material issue of fact that the Defendant, Idaho Power,

abused its discretion in denying Connie Dayley long term disability benefits and there is no

substantial competent evidence in the records to justify denial of long term disability

benefits. This motion is submitted on the record that existed prior to the Court's ruling of

**MOTION FOR SUMMARY JUDGMENT - 1**

11⁵